FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

97 OCT 22 PM 3: 53

U.S. DISTRICT COURT
N.D. OF ALABAMA

THE WATER WORKS & SEWER BOARD OF THE
CITY OF BIRMINGHAM,

      Plaintiff,

vs.

UNITED STATES DEPARTMENT OF ARMY,
CORPS OF ENGINEERS, et al.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CV 95-PT-2956-S

**ENTERED**

[OCT 2 2 1997

---

## Memorandum Opinion

---

This cause comes on to be heard on a motion for summary judgment filed by defendant City of Bessemer ("Bessemer") on July 30, 1997; a motion for summary judgment filed by defendants United States Army Corps of Engineers, Togo D. West, Jr., Lt. Gen. A. E. Williams, and Col. William S. Vogel (collectively, "Corps") on July 30, 1997; and a motion to allow limited discovery and a hearing, and cross motion for summary judgment filed by the plaintiff Water Works & Sewer Board of the City of Birmingham ("Water Works") on August 29, 1997. The issues raised by Bessemer and the Corps in their separate motions are substantially the same. The parties' dispute concerns the validity of a Department of the Army Permit for work in "waters of the United States" issued by the Corps on March 17, 1997. The plaintiff contends that the permit was improperly issued (1) because the Corps failed to have a requested hearing on the validity of the permit in violation of the Corps' regulations, the statutes governing the Corps' permitting process and the Due Process Clause of the Fifth Amendment; (2) because the Corps failed to adequately

47

consider the substantial adverse effects of the permitted activity on the public interest; (3) because the Corps erroneously failed to require preparation of an environmental impact statement in violation of the National Environmental Policy Act, 42 U.S.C. § 4321, et seq.; and (4) because the permitted activity of Bessemer will not comply with the Environmental Protection Agency's Guidelines for Specification of Disposal Sites for Dredged or Fill Material, 40 C.F.R. § 230, et seq. The defendants contend that the Corps properly permitted a prospective intake structure and pipeline intended to provide water for an independent water treatment and distribution system in Bessemer and that its decision is properly supported by the administrative record. The plaintiff asserts that it should be granted an opportunity for discovery outside of the administrative record and that it should be granted a hearing on the basis of the discovery results.

Facts

The Water Works & Sewer Board of the City of Birmingham ("Water Works"), originally the Birmingham Waterworks Company, is an Alabama public corporation that was initially "chartered for public service by legislative act approved February 13, 1885. Sess. Acts 1884-85, p. 415." Birmingham Waterworks Co. v. City of Birmingham, 58 So. 204, 204, 176 Ala. 301, 301 (Ala. 1912); State ex rel. Weatherly v. Birmingham Waterworks Co., 64 So. 23, 26-27, 185 Ala. 388 (Ala. 1913). The purpose of the Water Works, as first stated, was to "greatly promote the health and comfort of the citizens of Birmingham, in Jefferson county, Alabama, and its suburbs, to have an ample supply of good and pure water. . . ." Birmingham Waterworks Co. v. City of Birmingham, 58 So. at 204. The Water Works describes itself as being "the largest water utility in the State of Alabama, serving approximately 25 million gallons per day of raw water to industrial customers, and approximately 108 [million gallons per day] of potable water to approximately one million people. . . ." Plaintiff's Brief in Response to Bessemer's Motion for Summary Judgment at 2-3; also, Administrative Record at 209. The Water Works has four sources of water: the Cahaba River, the Mulberry Fork of the Black Warrior River, the Sipsey Fork of the Black Warrior River and Inland Lake.

The City of Bessemer has, for forty-six years, purchased water from the Water Works to sell to its residents. At present, ten to thirteen million gallons of water per day are purchased by Bessemer from the Water Works for residential, agricultural and industrial purposes. Bessemer has,

2

however, grown weary of its reliance on the Water Works and seeks to develop its own water supply, treatment and distribution system.[1]  To develop the independent water system, Bessemer would build an intake structure on the Black Warrior River at Taylor's Ferry, downstream from Bankhead Lake; a water treatment plant at which the withdrawn water would be made potable; and an associated thirty-inch diameter pipe that would connect the intake structure to the treatment plant and the treatment plant to the water distribution system of Bessemer.  At full operating capacity, the intake system would be capable of removing twenty-five million gallons of water per day from the Black Warrior River.[2]  From the treatment plant, the water would be channeled through pre-existing pipes to end-line customers.

On June 2, 1995, Bessemer submitted an application for a Corps of Engineers' permit pursuant to section 10 of the River and Harbors Act of 1899 (33 U.S.C. § 403) and section 404 of the Clean Water Act (33 U.S.C. § 1344) to construct the water intake structure on the Black Warrior River and associated pipeline crossings.  On June 28, 1995, the Army Corps of Engineers ("Corps") issued public notice of the permit application and provided a thirty day period ending on July 28, 1995, within which comments on the proposed project were to be submitted.  The Corps received comments from various state, local and federal agencies, in addition to private individuals.  On July 28, 1995, the Corps extended the comment period in response to a request for an extension of time and for a public hearing by the Water Works.  On August 11, 1995, the Water Works submitted "extensive" comments setting forth its objections to the permit and reiterated its request for a hearing.

On October 30, 1995, the Corps formally denied the Water Works' request for a public hearing, stating that "a public hearing would not provide any additional information which would assist in making a final decision in this request for a permit."  Administrative Record ("A.R.") at 308.  On the next day, the Corps issued a Statement of Findings, which included an environmental

---

[1]  The decision to cancel the contract with the Water Works and build an independent water system was made after the Water Works threatened Bessemer with a five percent rate hike.

[2]  It should not be inferred from this that twenty five million gallons per day would be drawn from the Black Warrior River through the intake structure.  Although the court does not intend to supplement to the record, it notes that use may, in fact, go down.  Evidence submitted by the Water Works and addressed by the Corps indicates that initially at least, the cost to Bessemer of producing water than it would be greater if the water was purchased from Birmingham and resold.  Although the market for water use is relatively inelastic, the higher price needed to cover costs of production (even if Bessemer chooses not to set price to maximize profits) might reduce the amount of gallons consumed.

assessment and an evaluation of compliance with the EPA's Clean Water Act Guidelines and which addressed the comments received, including, allegedly, those of the Water Works. On November 13, 1995, the Corps issued a permit to Bessemer authorizing construction of the water intake structure and associated pipeline. Three days later, the Water Works filed suit in this court seeking review of the Corps' action.

Around March 1, 1996, the Corps suspended its permit to consider in more depth the impacts associated with the intake structure and the pipeline route proposed by Bessemer. At the same time, the parties moved jointly to stay the case while such consideration was taking place. On March 4, 1996, the court granted the stay. According to the Corps, while the stay was in effect, it considered issues raised by the Water Works, as contained in the affidavits of Bruce Schwenneker and Gene Hanson that were submitted to the court in February 1996.

A year after the stay went into effect, on March 17, 1997, the Corps issued a revised Statement of Findings on the permit application, accompanied by an environmental assessment and an evaluation of compliance with the EPA's Clean Water Act Guidelines. On the same day, it reissued Bessemer's permit. The issues raised in the various motions are now before the court.

Contentions & Analysis

The court assumes, without deciding, that the Water Works has standing to raise its various complaints. It may have standing as to some and not as to others.

I. THE BENEFIT OF A HEARING.

The plaintiff's first contention is that it was denied a hearing in violation of (1) the regulations issued by the Corps governing the circumstances under which a hearing is to be granted; (2) the Administrative Procedure Act and the relevant sections of the statutes under which the Corps' authority to regulate is described; and (3) Fifth Amendment due process, even if the Corps in fact complied with the regulations and statutes. The defendants dispute all of these arguments.

**A. Compliance with the Regulations.**

The Corps' regulations elucidating the criteria for the grant of a public hearing, 33 C.F.R. § 327.4, state:

4

(a) A public hearing will be held in connection with the consideration of a DA [Department of the Army] permit application or a Federal project whenever a public hearing is needed for making a decision on such permit application or Federal project. In addition, a public hearing may be held when it is proposed to modify or revoke a permit. (See 33 CFR 325.7).
(b) Unless the public notice specifies that a public hearing will be held, any person may request, in writing, within the comment period specified in the public notice on a DA permit application or on a Federal project, that a public hearing be held to consider the material matters at issue in the permit application or with respect to Federal project. Upon receipt of any such request, stating with particularity the reasons for holding a public hearing, the district engineer may expeditiously attempt to resolve the issues informally. Otherwise, he shall promptly set a time and place for the public hearing, and give due notice thereof, as prescribed in § 327.11 of this Part. Requests for a public hearing under this paragraph shall be granted, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing. The district engineer will make such a determination in writing, and communicate his reasons therefor to all requesting parties. Comments received as form letters or petitions may be acknowledged as a group to the person or organization responsible for the form letter or petition.
(c) In case of doubt, a public hearing shall be held. . . .
(d) In fixing the time and place for a hearing, the convenience and necessity of the interested public will be duly considered.

The Eleventh Circuit has interpreted the Corps' regulations to mean that the grant of a public hearing by the Corps is discretionary.

> The applicable regulations provide the Corps discretion to hold hearings on permit applications on an "as needed" basis. 33 C.F.R. § 327.4. If the Corps determines that it has the information necessary to reach a decision and that there is "no valid interest to be served by a hearing," the Corps has the discretion not to hold one. Id. § 327.4(b).

Fund for Animals v. Rice, 85 F.3d 535, 545 (11th Cir. 1996). In reviewing whether an agency's decision to decline public hearing request comports with the agency's regulations, an arbitrary and capricious standard is to be employed by the court. Id.

> In considering [whether an agency's action is arbitrary and capricious] the Court may not substitute its judgment for that of the agency and can set aside an agency's decision only if the agency relied on improper factors, failed to consider important relevant factors, or committed a clear error of judgment that lacks a "rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 [] (1983) (internal quotations and citations omitted); Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Engineers, 87 F.3d 1242, 1246 (11th Cir.1996); Florida Manufactured Hous. Ass'n, Inc. v. Cisneros, 53 F.3d 1565, 1572 (11th Cir.1995).
>     While we must conduct a "searching and careful" inquiry to assess whether the decision bears the requisite connection to the relevant facts, our ultimate standard of review is narrow and deferential to the agency's conclusions. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 [] (1971). Agency action must be presumed valid and rejected only for " 'substantial procedural or substantive reasons . . . not simply because the court is unhappy with the result reached.' " Manasota- 88, Inc. v. Thomas, 799 F.2d 687, 691 (11th Cir.1986) (quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources

Defense Council, Inc., 435 U.S. 519, 558 [] (1978)).

Arango v. United States Department of the Treasury, 115 F.3d 922, 928 (11th Cir. 1997).

The Water Works argues that it properly requested in writing a public hearing within the time period prescribed by the regulation and that it clearly elucidated its reasons for requesting the hearing. In its letter to the Corps, the Water Works detailed concerns related to public needs and welfare, the economic impact of the project, water supply and conservation, property rights and practicable alternatives to the project. In addition, the Water Works requested a public hearing:

> to more specifically consider the following matters including, but not limited to: conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, property ownership considerations and general welfare needs of the public. In addition, this hearing is requested so that the public and in particular the citizens and customers of Bessemer and the customers of the [Water Works] Board, will have the opportunity to respond to the issues set out above that have a direct effect on economy and lifestyle.

A.R. at 218. In short, the Water Works raised, in addition to particularized reasons for a public hearing, the laundry list itemized in 33 C.F.R. § 320.4 (a)(1). Characterizing its listing of concerns as satisfaction of a "threshold burden," the plaintiff argues that "the burden" shifted to the Corps to either informally resolve its concerns, deny the hearing in a writing stating why a hearing would be unhelpful, or grant a hearing. Maintaining that the Corps failed to properly pursue the first two options, the Water Works reasons that the Corps was required to grant a hearing.[3]

The Water Works first asserts that the Corps did not attempt to resolve the matter informally. It next avers that the Corps' written denial of a hearing was given on an insufficient

---

[3] Characterizing the obligations of the Water Works and the Corps as a set of demonstrative "burdens" is questionable. The use of the term "burden" in this context implies that the party who carries the obligation must perform to the demonstrative satisfaction of some adjudicator. This is not the case. A petitioner, as a precursor to a Corps' hearing determination, must merely request a hearing in an appropriate form. Once that antecedent condition is satisfied, the Corps is obligated either (1) to resolve the issues raised informally, (2) to deny a hearing in writing, stating reasons why the hearing would be unhelpful or (3) to grant the hearing, where such would be of aid. Although describing the Corps as having a burden to show that a hearing is unhelpful, it makes little sense to state that it has a "burden" of granting a hearing — a hearing is either properly granted or it is not.

The point is grammatical. The language used by the Water Works implies that action by the Corps is to be taken in anticipation of litigation rather than as executing a statutory duty. However, the procedures followed by the Corps are not followed as pre-litigation behavior, but are obligations meant to insure reasoned determinations by the Corps. The court is, therefore, not required to find that the Corps satisfied or failed to satisfy some demonstrative burden. Instead, it is required only to determine whether the Corps carried out its statutory or regulatory obligations in a non-arbitrary and non-capricious manner. It is only where an agency fails to perform its procedural and substantive obligations — such as where it fails to give genuine reasons for a decision where those reasons are due — that an agency's behavior will be arbitrary and capricious. Reasons, however, are not and are not expected to be, proof.

basis because the Corps' decision "simply set forth the Corps' rationale for justifying the ultimate issuance of the permit to Bessemer . . ." The defendants answer that the Corps concluded that the Water Works sufficiently articulated its concerns to the Corps in its comments and informal discussions and that, therefore, no additional information was required.[4]

In its written statement denying a hearing, the Corps District Engineer addressed the Water Works' reasons for the grant of a public hearing:

> The U.S. Army Corps of Engineers jurisdiction in this permit application relates to the construction of the water intake structure in navigable waters of the U.S. The primary focus of our evaluation will be on the direct impacts of the structure (e.g. navigation, water quality, threatened/endangered species, and cultural resources). Our regulations at 33 CFR 320.4(m) and guidance contained in Regulatory Guidance Letter 85-6 states that the primary responsibility for water allocation rests with the states.
>
> In response to the public notice[,] letters of no objection or authorization were received from the U.S. Fish and Wildlife Service, National Marine Fisheries Service, Alabama Department of Conservation and Natural Resources, Alabama Department of Environmental Management, Alabama State Docks, and the Alabama Historical Commission. Coordination with these agencies indicates that the proposed project will not adversely impact fish and wildlife, threatened and endangered species, properties on or eligible for the National Register of Historic Places, navigation, and water quality.
>
> The decision of the City of Bessemer to seek its own water supply and the consequences of the decision (higher prices, and reliability) are the responsibility of the locally elected officials, not the Corps. Policy at 33 CFR 320.4(q) states that ". . . it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place".
>
> Although the granting of Bessemer's requested permit will provide a new water withdrawal point on the Black Warrior River, it should not increase the demand for water in the short term. The water to be withdrawn by Bessemer is currently being withdrawn by the [the Water Works] at other locations and sold to Bessemer. If [the Water Works] developed new customers to replace Bessemer, additional demands on water resources would result. It is estimated that up to 70 per cent of the water withdrawn by Bessemer would be returned to Black Warrior River as treated waste water thus reducing the net withdrawal to 7.5 [million gallons per day].
>
> The proposed Bessemer intake is downstream of all the [Water Works] intakes and will probably not impact the [Water Work's] withdrawal except during droughts when the Bankhead Lake level is low. Future increases in water withdrawals will likely impact navigation depths during droughts, however, the allocation of water for multi-purpose use is primarily a State issue. If navigational servitude is impaired, Federal authority to protect navigation preempts the State's right to allocate water use.

A.R. at 307-08. Based upon his analysis of the concerns raised by the Water Works, the district engineer concluded that sufficient data existed with respect to the issues raised by the Water Works

---

[4] It apparently found the laundry list, on the other hand, insufficiently 'particular' as required under 33 C.F.R. § 327.4 to merit an extended response.

such that no hearing would be necessary. Given the reasons stated and the factors considered, the district engineer reasonably concluded that no additional information would be useful in evaluating the appropriateness of granting a permit to Bessemer.

The Water Works insists that the affidavit later filed by Dr. Bruce W. Schwenneker (which was addressed by the Corps in its final permitting decision) demonstrates that a public hearing was needed to flesh out the concerns stated by the Water Works. The Corps needed only to consider whether the issues raised by the party requesting a public hearing were sufficiently undefined as to require that hearing. On the basis of the concerns stated by the Water Works in its letter, the Corps, within its appropriate range of discretion, determined that the problems were adequately presented and did not require public hearing for additional statement and clarification in accordance with its regulations. The decision to deny a public hearing was neither arbitrary nor capricious.

## B. Statutory Hearing Requirements.

The Water Works avers that, even supposing the refusal to hold a public hearing were not a violation of the Corps' regulations on the grant of public hearings, the Corps' refusal nonetheless violated the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment. On the issue of whether a hearing determination that conforms to the regulations complies with section 5 of the Administrative Procedure Act, section 10 of the Rivers and Harbors Act of 1899 and section 404 of the Clean Water Act, no case directly addressing the issue has emerged.[5] However, cases that have broached the issue lead this court to the conclusion that the denial of a hearing was not violative of the above-listed statutes. The Fifth Circuit Court of Appeals commented in Buttrey v. United States, 690 F.2d 1170, 1176 (5th Cir. 1982), that a public hearing "'usually means a speechmaking hearing rather than a (trial-type) hearing with a determination on the record.' 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 12:7, at 434 (2d ed. 1979)." See also Taylor v. District Engineer, 567 F.2d 1332, 1338 (5th Cir. 1978). The Fifth Circuit also noted that, in general, the purpose of the speechmaking hearing for federal agencies was to gain input to assist the agency in making decisions, id., implying that if an agency found that sufficient input was had from comments submitted a public hearing was unnecessary. "A Federal agency is not required to conduct public hearings before making a threshold determination as to the need for an EIS so long

---

[5] Most cases on involve the denial of a formal hearing, not a public hearing.

as members of the public are given the opportunity to submit facts which might bear upon the agency decision." Sierra Club v. Alexander, 484 F.Supp. 455, 471 (N.D.N.Y. 1980) (citing WATCH (Waterbury Action, etc.) v. Harris, 603 F.2d 310, 326 n.36. (2ᵈ Cir. 1979)) aff'd 633 F.2d 206 (2ᵈ Cir. 1980). See also AJA Assoc. v. Army Corps of Engineers, 817 F.2d 1070, 1073-74 (3ᵈ Cir. 1987). In Fund forAnimals, Inc. v. Rice, 85 F.3d 535, 545 (11ᵗʰ Cir. 1996), the Eleventh Circuit Court of Appeals implied that the opportunity for public hearing crafted by the Corps in its regulations adequately complied with the Clean Water Act:

> The CWA mandates an "opportunity for public hearings." See 33 U.S.C. § 1344(a). However, the statute does not state that the Corps itself must hold its own public hearings regardless of how many other hearings have been held on a project. The applicable regulations provide the Corps discretion to hold hearings on permit applications on an "as needed" basis. 33 C.F.R. § 327.4. If the Corps determines that it has the information necessary to reach a decision and that there is "no valid interest to be served by a hearing," the Corps has the discretion not to hold one. Id. 327.4(b).

## C. Due Process.

In resolving whether the Corps decision to deny a hearing violated due process, this court is to apply a de novo standard of review. Summary judgment is appropriate only if this court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial responsibility of informing this court of the grounds for its motion, and identifying those portions of the record, pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes prove the absence of a genuine issue of material fact. Id. at 323. Once the moving party has met this burden, the nonmoving party "must produce evidence that shows there exists a genuine issue of material fact." Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, admissions on file and, in this case, the administrative record designate specific facts showing the presence of a genuine issue for trial. Celotex, 477 U.S. at 324. The court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . " in deciding whether to grant or deny a summary judgment motion. FED. R. CIV. P. 56(c). In resolving whether a given factual dispute requires submission to a jury, the court

must view the presented evidence through the prism of the substantive evidentiary burden. Anderson, 477 U.S. at 254-55.  The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations.  Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

With respect to whether the denial of a public hearing is consistent with modern understandings of Fifth Amendment Due Process, the Fifth Circuit Court of Appeals has held, in a case involving an earlier version of the Corps regulations regarding public hearings, that "the procedures set forth in the regulations of the Corps easily satisfy the requirements of due process." Taylor v. District Engineer, 567 F.2d 1332, 1338 (5th Cir. 1978).[6]  Any decision comporting with those regulations would, therefore, satisfy due process, even if the resulting decision was substantively incorrect.

In the absence of a fundamental interest, to be entitled to due process protection, a plaintiff must have a protected life, liberty or property interest, the deprivation of which is to be afforded due process.  Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982); Zipperer v. City of Fort Myers, 41 F.3d 619, 623 (11th Cir. 1995).  Two potential sources exist for the Water Works' claimed entitlement to due process: (1) the regulations stating that interested parties are entitled, in certain circumstances, to a hearing and (2) the Water Works' riparian rights and economic interests in the outcome of the permitting decision.  The first basis for an interest, that the statute or regulations entitle it to a hearing in certain circumstances, fails, as there is no protected interest in a procedural right.  In Olim v. Wakinekona, 461 U.S. 238, 250-51 (1983), the Supreme Court stated:

> [a]s the United States Court of Appeals for the Seventh Circuit recently stated in Shango v. Jurich, 681 F.2d 1091, 1100-1101 (1982), "[a] liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality."  Process is not an end in itself.  Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement. . . .  The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right. . . .

See also Merritt v. Broglin, 891 F.2d 169, 172 (7th Cir. 1989)("State created procedural rights are insufficient to create a substantive liberty interest.").  The interest of the Water Works in the regulation and statute is a mere right to procedure, i.e., a hearing, created with the purpose of

---

[6] Decisions of the Fifth Circuit Court of Appeals made prior to the circuit split are binding as precedent upon this court unless otherwise overruled by the Eleventh Circuit Court of Appeals.

protecting the substantive interests of the permit applicant and the public.  However, the interests
of the public, and in this case the Water Works, being protected by the Corps' procedures are far
broader than the interests that the Corps is constitutionally required to protect through its
procedures.

The deprivations of substantive interests — economic loss and infringement of riparian
rights — which the Water Works maintains will occur if a hearing is denied are indirect
consequences of a decision by the Corps to permit Bessemer to build the intake structure, pipeline
and water treatment plant.  Indirect deprivations of interests are, however, outside of the purview
of the due process clause.  O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 787 (1980);
Dumas v. Kipp, 90 F.3d 386, 391 (9th Cir. 1996); and Rivers v. Schweiker, 684 F.2d 1144, 1158 (5th
Cir. 1982).[7]

─────────────────

[7] The court is uncertain whether a municipal corporation is entitled to the due process protections of the
Fifth Amendment at all.  In State of South Carolina v. Katzenbach, 383 U.S. 301, 323-24 (1966), the Supreme Court
stated:

> The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any
> reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our
> knowledge this has never been done by any court.  See International Shoe Co. v. Cocreham, 246 La.
> 244, 266, 164 So.2d 314, 322, n. 5, cf. United States v. City of Jackson, 318 F.2d 1, 8 (C.A. 5th Cir.).
> Likewise, courts have consistently regarded the Bill of Attainder Clause of Article I and the principle
> of the separation of powers only as protections for individual persons and private groups, those who
> are peculiarly vulnerable to non-judicial determinations of guilt.  See  United States v. Brown, 381
> U.S. 437 []; Ex parte Garland, 4 Wall. 333 [].  Nor does a State have standing as the parent of its
> citizens to invoke these constitutional provisions against the Federal Government, the ultimate
> parens patriae of every American citizen.  Com. of Massachusetts v. Mellon, 262 U.S. 447, 485-486
> []; State of Florida v. Mellon, 273 U.S. 12, 18 [].

At issue is whether, like a state, a municipality enjoys no protection of the Due Process Clause of the Fifth
Amendment.  In the past, the Supreme Court has held that a municipal corporation could not assert federal
constitutional rights against their progenitors, the states.  See Williams v. Mayor and City of Baltimore, 289 U.S. 36, 40
(1933) and cases cited therein.  In City of Safety Harbor v. Birchfield, 529 F.2d 1251, 1254-55 (5th Cir. 1976)
(footnotes omitted), the Fifth Circuit Court of Appeals elaborated on this basis for denying municipal corporations the
protections of federal rights as against the states:

> Ever since the Supreme Court's landmark decision in Dartmouth College v. Woodward, 17 U.S. (4
> Wheat.) 518 [] (1819), it has been apparent that public entities which are political subdivisions of
> states do not possess constitutional rights, such as the right to be free from state impairment of
> contractual obligations, in the same sense as private corporations or individuals. 17 U.S. (4 Wheat.) at
> 660--61 [].  Such entities are creatures of the state, and possess no rights, privileges or immunities
> independent of those expressly conferred upon them by the state.  Id.; Williams v. Mayor and City
> Council of Baltimore, 289 U.S. 36, 40 [] (1933); see Railroad Commission v. Los Angeles RR., 280
> U.S. 145, 156 [] (1929); Risty v. Chicago, R.I. & P.R.R., 270 U.S. 378, 390 [] (1926); City of New
> York v. Richardson, 2 Cir., 1973, 473 F.2d 923, 929, cert. denied sub nom. Lavine v. Lindsay, 412
> U.S. 950 [] (1973).  Thus, in Trenton v. New Jersey, 262 U.S. 182 [] (1923), the Supreme Court held
> that a city which had obtained its water resources by acquiring a private water company through
> proper exercise of its proprietary authority could not assert the right to freedom from impairment of
> contractual obligations because of the difference in the relation of private and public entities to the
> state.  In contrast to private individuals and entities, municipal corporations have repeatedly been

11

## II. THE PUBLIC INTEREST REVIEW.

The second grounds for remand raised by the plaintiff is that the Corps inadequately considered the impact of Bessemer's proposed water project on the public interest. The Water Works contents that the Corps failed to conduct an adequate public interest review because (1) the Corps' analysis was too narrow in scope; (2) the Corps did not conduct an adequate consideration of the need of the project; (3) the Corps did not appropriately consider alternatives to the construction of the project; (4) the Corps did not consider water supply in making its decision; (5) the Corps failed to address the economic impacts of the project; (6) the Corps insufficiently addressed the issue of water quality; and (7) the Corps did not fully consider the impacts of the

---

denied the right to challenge state legislation allegedly violative of the Federal Constitution. Williams v. Mayor and City Council of Baltimore, supra; Pawhuska v. Pawhuska Oil & Gas Co., 250 U.S. 394, 398 [] (1919) ('as respects grants of political or governmental authority to cities, towns, counties, and the like the legislative power of states is not restrained by the contract clause of the Constitution'); City of New Orleans v. New Orleans Water-Works Co., 142 U.S. 79 [] (1891).

See also Appling County v. Municipal Electric Authority of Georgia, 621 F.2d 1301, 1307-08 (5th Cir. 1980).

An apparent corollary of the argument given by the Fifth Circuit, that a municipality derives all of its rights, privileges and immunities from the state's conference of those rights on the municipality, is that it is impossible for the municipality to have any rights, privileges or immunities that cannot be conferred by the state. The state, as an entity not enjoying the protections of the Due Process Clause may not be able to confer Fifth Amendment Due Process rights upon the municipality. See City of Sault Ste. Marie, Michigan v. Andrus, 532 F. Supp. 157, 167-68 (D.C.D.C. 1980). The weakness of this argument is that constitutional rights are supposedly non-transferrable (read "inalienable") and, therefore, cannot be imparted on an individual or organization by the state, a citizen or anything else, aside from the Constitutional provisions.

Apparently, the resolution to the problem is not to be found in consideration of what rights are conferred by whom, but through an examination of the meaning of the term "person" in the Fifth Amendment to determine if municipal corporations are directly protected. Here, though, there exists conflicting guidance. The relevant portion of the Fifth Amendment states:

. . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life liberty, or property without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. CONST., AMENDMENT V. As a structural matter, given that the rights enumerated are all granted to the same subject, "any person," a determination of who is a person for any one the enumerated rights should extend equally to any other rights in the clause. One provision of the Fifth Amendment, the takings clause, has been held by the Supreme Court to bestow a right upon a municipality. See Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268,278 n.31 (1969). At the same time, the Supreme Court has held that "the privilege against compulsory self-incrimination should be 'limited to its historic function of protecting only the natural individual from compulsory incrimination through his own testimony or personal records.' " Bellis v. United States, 417 U.S. 85, 89-90 (1974)(quoting United States v. White, 322 U.S. 694, 701 (1944).

Perhaps the issue can be resolved by affiliating the Due Process Clause with the self-incrimination provision of the Fifth Amendment because the two are part of the same phrase, whereas the Takings Clause exists as an entirely separate phrase. However, this argument borders on hair-splitting, as its conclusion rests entirely on the emphasis placed on the comma resting between the self-incrimination language and the Due Process Clause as compared to the semicolon placed between the Due Process Clause and the Takings Clause. A thorough resolution of the issue is only to be found in a careful historical analysis of the clause and its common law ancestry. However, such analysis is not necessary to this court's conclusion.

project on threatened and endangered species. Before addressing the substance of this extended argument, however, the court will examine the plaintiff's argument that in evaluating the Corps' decision to permit the Bessemer project the court should consider not only the administrative record, but should allow the plaintiff to conduct discovery and introduce materials extraneous to the record in a hearing before the court.

**A. Hearings and discovery.**

"The focal point for judicial review of an administrative agency's action should be the administrative record." Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Engineers, 87 F.3d 1242, 1246 (11th Cir. 1996). The Water Works contends that, although the administrative record is the focus in reviewing administrative action, where insufficient information exists in the record for the court to determine whether the agency's action is arbitrary and capricious, it should look beyond the record, allowing discovery and an in-court hearing. In Camp v. Pitts, 411 U.S. 138 (1973), the Supreme Court addressed the twin issues of when and to what extent a district court may conduct a hearing on a matter decided by an administrative agency. On the issue of when a district court may hold a hearing on review of a case from an agency, the Court stated that a hearing may be appropriate if an agency fails to adequately explain its decision. Id. at 142. However,

> [i]f the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

Florida Power & Light Company v. Lorion, 470 U.S. 729, 744 (1985); Preserve Endangered Areas of Cobb's History, Inc. [PEACH] v. United States Army Corps of Engineers, 87 F.3d at 1246 (quoting Florida Power & Light). In PEACH, the Eleventh Circuit Court of Appeals in passing noted four circumstances (elaborated by the Ninth Circuit Court of Appeals in Animal Defense Council v. Hodel, 840 F.2d 1432, 1436-37 (9th Cir. 1988)), that could potentially support a decision by a district court to hold a hearing:

> The Ninth Circuit has specified that a court may go beyond the administrative record only where: 1) an agency's failure to explain its action effectively frustrates judicial review; 2) it appears that the agency relied on materials not included in the record; 3) technical terms or complex subjects need to be explained; or 4) there is a strong showing of agency bad faith or

improper behavior. (Citation omitted) We need not consider these exceptions as none of them apply in the instant case.

Preserve Endangered Areas of Cobb's History, Inc. [PEACH] v. United States Army Corps of Engineers, 87 F.3d at 1246 n.1. Even were the court to accept the four listed exceptions as an accurate statement of the law of this circuit, the plaintiff has not shown that the Corps' decision is flawed for any of the listed reasons. The only basis argued by the Water Works as justifying a hearing is that, in giving "abstract and conclusory" grounds for granting Bessemer's permit, the Corps failed to adequately explain its decision and thereby frustrated judicial review. Far from being abstract and conclusory, however, the district engineer's permitting decision is thorough and thoughtful. The explanations given by the district engineer are sufficiently clear and developed to allow this court to review the record and determine whether the decision was arbitrary and capricious.

The Water Works asserts, as an additional reason for the grant of a hearing, that because the Corps was required to undertake an environmental assessment in accordance with the National Environmental Policy Act ("NEPA"), this court is not obligated to confine its review to the administrative record. Instead, the plaintiff argues, the court is authorized to look beyond the administrative record to consider factors that the district engineer may have ignored. The impact of this argument is, however, confined to the Corps' environmental assessment and will be taken up in more detail when the court reviews the Corps' environmental assessment of the Bessemer project. At this point, the court simply notes that any NEPA provision permitting the submission of new evidence for examining the adequacy of the Corps' environmental assessment does not extend to the Corps' public interest review and the Corps' review under the Environmental Protection Agency's Guidelines governing permits for discharges of dredged or fill material promulgated through section 404(b)(1) of the Clean Water Act.

## B. Scope of Review.

In considering any permit application, the Corps is required to follow, at a minimum, the regulations set out in 33 C.F.R. §§ 320-329. The regulations contained in this section obligate the Corps to consider certain general factors in every permitting decision and, depending upon the activity being permitted, other more specific factors and policies. See 33 C.F.R. § 320.1(b) & § 320.4. The review conducted under these regulations is deemed the "public interest review" and is

14

elaborated in detail in 33 C.F.R. § 320.4(a)(1):

(a) Public Interest Review.

(1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process. That decision should reflect the national concern for both protection and utilization of important resources. All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people. For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines. Subject to the preceding sentence and any other applicable guidelines and criteria (see §§ 320.2 and 320.3), a permit will be granted unless the district engineer determines that it would be contrary to the public interest.

See also Van Abbema v. Fornell, 807 F.2d 633, 636 (7th Cir. 1986). Certain criteria are to be evaluated in every application for a permit:

(i) The relative extent of the public and private need for the proposed structure or work;
(ii) Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and
(iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited.

33 C.F.R. § 320.4(a)(2). In addition, certain factors, such as conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, etc., are to be considered and evaluated based upon their relative importance to the project at hand. 33 C.F.R. § 320.4(a)(3).

In conducting the public interest review, the Corps is limited in the aspects of the entire project on which it may focus. The Water Works first questions the limitations the Corps placed on the scope of its public interest review. According to the Water Works, the Corps, in conducting its public interest review, impermissibly confined itself to examining the impacts of the construction

15

and maintenance of the intake facility and the construction and maintenance of the pipeline across various streams and other waters and wetlands. Allegedly, it did not review the consequences of the entire project, including construction and maintenance the proposed water treatment plant. The Water Works contends that examination of these aspects of Bessemer's proposed project was required under the public interest review. Although the Water Works cites no law to support its contention, it argues that because the public interest review is a "broad review," not only should the structures affecting the navigable waters of the United States be evaluated, but also those structures that help fulfill the purposes of the project.

The defendants respond that the plaintiff's contention that a "broad review" is required is mistaken, stating that the scope of the overall project review that the Corps is to undertake is governed by the National Environmental Policy Act ("NEPA") implementation procedures for the regulatory program that are contained at 33 C.F.R. Pt. 325 App. B § 7.b. The plaintiff counters that 33 C.F.R. Pt. 325 App. B § 7 does not apply to the public interest review because its only stated purpose is to guide the NEPA review of the action. The defendants dispute this contention and point to 33 C.F.R. Pt. 325, App. B § 7.a, which states that "[t]he EA [NEPA environmental assessment] should normally be combined with other required documents (EA/404(b)(1)/SOF/FONSI). 'EA' as used throughout this Appendix normally refers to this combined document." According to the defendants, because the environmental assessment as described in appendix B includes the other documents involved in other evaluations, the regulations governing the jurisdictional scope of the NEPA review by definition govern the jurisdictional scope of the public interest review.[8]

In Sylvester v. Army Corps of Engineers (Sylvester II), 882 F.2d 407, 410 n.4 (9th Cir, 1989), the Ninth Circuit Court of Appeals noted a distinction between the scope of the public interest review and the NEPA review:

> [U]nder the C.W.A. [Clean Water Act], the Corps is not limited by a regulation similar to 33 C.F.R. pt. 325 app. B § 7. . . . As a consequence, the Corps could properly consider a wider range of facts in conducting its public interest analysis.

The language in Sylvester II notwithstanding, the court is convinced that the extent of the entire project reviewable by the Corps under its public interest review is essentially the same as the extent

---

[8] The court here notes that the arguments garnered by the plaintiff in support of its positions tend to be a mish-mash of statutory and regulatory provisions assembled without contextual or other guides. The plaintiff manages to confuse, conflate and combine regulations and laws governing all three forms of review throughout its briefs.

of review permitted under the NEPA analysis. First, the language of the regulation defining the focus of the public interest review limits that focus to the effects of the "proposed activity":

> The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. . . . The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process.

33 C.F.R. § 320.4. The above makes it clear that what is meant by "proposal" is that which the Corps has the capacity to authorize. However, only the portion of an overall project that occurs in the navigable waters of the United States can be authorized by the Corps. The Corps has no authority to permit or even regulate any other activity, although it may consider the direct, indirect and cumulative impacts of the proposed activity. The Corps' public interest review is not to cover the totality of all activities, however.

Further, the results of the public interest review are to be recorded in a statement of findings, in conjunction with the other review documents. 33 C.F.R. § 325.2. That the regulations, in the same section in which the scope of analysis for the environmental assessment ("EA") is described, state that the "EA" refers to the combined document containing the statement of findings indicates to the court that the scope of analysis considered in 33 C.F.R. Pt. 325 App. B. § 7 is the same as the activity to be considered under 33 C.F.R. § 320.4(a)(1).[9]

The Corps drafted its first set of regulations governing the scope of review in cases involving both federal and non-federal actions in 1980. See Sylvester v. U.S. Army Corps of Engineers, 884 F.2d 394, 398 (9th Cir. 1989). The same year, the Fifth Circuit Court of Appeals, in Save the Bay, Inc. v. United States Corps of Engineers, 610 F.2d 322, 327 (5th Cir. 1980),[10] held that the Corps' regulations limited its public interest review in certain cases to the federal aspects of a project and that the Corps was not required to consider the entire proposed project in conducting

---

[9] Not that it makes any considerable difference whether the "proposed action" considered in the public interest review and the "scope" of the NEPA review overlap as a matter of regulatory definition. Even if the focus of the two reviews are not necessarily co-extensive, they are contingently co-extensive in this case. The proposed activity as defined by the district engineer in his statement of findings, see infra at 21, is precisely the same as the scope of analysis decided by the district engineer in the environmental assessment attachment. See discussion of district engineer's jurisdiction determination, infra at 22-24.

[10] This case and the one discussed after it (Winnebago) are both principally National Environmental Policy Act cases and the issue of the scope of review is centered on what the scope of review is in developing an environmental assessment.

its review.  In Save the Bay, Du Pont De Nemours & Co., Inc., proposed to build a titanium dioxide plant in Delisle, Mississippi, a town located near Bay St. Louis (an inlet from the Mississippi Gulf Coast).  Associated with the building of the plant was construction of a 24-inch pipeline that would extend 2,000 feet and discharge industrial wastewater into the Bay of St. Louis.  Id. at 323-24.  The Corps permitted the construction of the pipeline and, in deciding to do so, considered solely the consequences of the pipeline construction and discharge, not of the construction and maintenance of the titanium dioxide plant as a whole.

The plaintiffs objected to the Corps permitting decision in the district court, arguing, among other things, that the Corps had an obligation to consider the effects of the entire project.  In support of its contention, the plaintiffs argued that if any portion of the proposed activity was enabled by the pipeline, the consequences of the enabled activity should be considered in addition to the impacts of the construction and maintenance of the pipeline itself.  Because, the plaintiffs alleged, the pipeline enabled the plant to discharge its waste water, the plant was enabled by the pipeline and the impacts of its construction and maintenance should have been considered.  The Fifth Circuit Court of Appeals stated that if the "enablement theory" was correct, the plant should have been considered in Corps' review of the permit.  However, the Fifth Circuit Court of Appeals rejected the "enablement theory" of the plaintiffs.  Id. at 327.  Instead, the Fifth Circuit merely found that the Corps was only required to consider the impacts of the pipeline in making its permitting decision.  The court did not elaborate on its basis for finding that the Corps could confine its review to the pipeline, but instead limited itself to explication of why the cases cited by the plaintiffs did not support the enablement theory.  Id. at 327.

In Winnebago Tribe of Nebraska v. Ray, 621 F.2d 269 (8th Cir. 1980), the Eighth Circuit Court of Appeals considered whether the Corps was required to evaluate an entire project involving the construction of a power line that crossed the Missouri River and would run through the Winnebago Indian Reservation.  The river crossing would extend 1.25 miles out of the total sixty-seven miles that the power line was to extend.  The Corps refused to extend its analysis beyond that portion of the line crossing the river.  Id. at 270.

The Winnebago Tribe and others brought an action in the district court to require the Corps to consider the impact upon the other sixty-five and some-odd miles, and the case eventually found its way to the Eighth Circuit Court of Appeals.  First, the Eighth Circuit distinguished the case before it from an earlier case in which an "enablement theory" was proposed.  Id. at 272.

18

Finding that "[i]n 'enablement' cases federal action is a legal condition precedent to accomplishment of an entire nonfederal project,"[11] the Corps' ability to deny permitting of only a section of the power line constituted "but-for" veto power over the project. (That is, but for the denial of the permit of the section of the line, the entire line could have been built.) The court then developed and applied three factors by which to determine if the Corps would have jurisdiction over an entire project based upon its ability to issue a permit as to a portion of the project.

> The court in Medical Center [], identified three factors helpful in determining whether "but for" or factual control requires project-wide analysis: (1) the degree of discretion exercised by the agency over the federal portion of the project; (2) whether the federal government has given any direct financial aid to the project; and (3) whether "the overall federal involvement with the project (is) sufficient to turn essentially private action into federal action." Id. at 629 (citation omitted). . . .
>
> In the present suit, while the Corps has broad discretion to consider environmental impacts (see Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970), cert. denied, 401 U.S. 910 [] (1971)), that discretion must be exercised within the scope of the agency's authority. As noted above, the Corps' jurisdiction under section 10 extends only to areas in and affecting navigable waters. See United States v. Sexton Cove Estates, Inc., 526 F.2d 1293, 1299 (5th Cir. 1976); Weiszmann v. District Engineer, United States Army Corps of Engineers, 526 F.2d 1302, 1304 (5th Cir. 1976); United States v. Joseph G. Moretti, Inc., 526 F.2d 1306 (5th Cir. 1976). As the Third Circuit observed in United States v. Stoeco Homes, Inc., 498 F.2d 597, 607 (3d Cir. 1974):
>
>> The federal environmental protection statutes did not * * * by their terms enlarge the jurisdiction of the Army Corps of Engineers under the Rivers and Harbors Appropriation Act of 1899. If there is no such jurisdiction environmental protection is still a matter primarily of state concern.
>
> Thus, the Corps' discretion under section 10 does not dictate project-wide review.
>
> The factors remaining for consideration under Medical Center are the presence of direct federal funding and the degree of federal involvement. There has been no direct or even indirect federal funding for this project. Cf. Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971) (Law Enforcement Assistance Administration involvement in and funding for a state prison amounts to major federal action). As for federal involvement, the fact that part of the line will cross the Winnebago Reservation does not suffice to turn this essentially private action into federal action. Federal law allows the state to condemn this land for any public purpose in the same manner as land owned in fee. 25 U.S.C. § 357 (1976). Thus, we conclude that the Corps did not have sufficient control and responsibility to require it to study the entire project.

Id. at 272-73 (footnotes omitted).

---

[11] As the Eighth Circuit Court of Appeals considered it, the Corps would have enablement jurisdiction over the entire project only when its legal decision governed the entire project. This may very well have been a question-begging answer to the issue of the "enablement theory" of jurisdiction, i.e., that the Corps has jurisdiction to review the entire project when it has jurisdiction to review the entire project.

Another point to note is that while both the Fifth Circuit and the Eighth Circuit discuss an "enablement theory" of Corps' jurisdiction, they clearly mean two different things by it.

In 1988, the Corps drafted an amendment to the regulations that effectively codified <u>Save the Bay</u> and <u>Winnebago</u>. <u>Sylvester v. U.S. Army Corps of Engineers</u>, 884 F.2d at 398. These regulations now state:

> b. Scope of Analysis. (1) In some situations, a permit applicant may propose to conduct a specific activity requiring a Department of the Army (DA) permit (e.g., construction of a pier in a navigable water of the United States) which is merely one component of a larger project (e.g., construction of an oil refinery on an upland area). The district engineer should establish the scope of the NEPA document (e.g., the EA or EIS) to address the impacts of the specific activity requiring a DA permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review.
>
> (2) The district engineer is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement <u>is sufficient to turn an essentially private action into a Federal action</u>. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action.
>
> Typical factors to be considered in determining whether sufficient "control and responsibility" exists include:
>
> (i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).
> (ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.
> (iii) The extent to which the entire project will be within Corps jurisdiction.
> (iv) The extent of cumulative Federal control and responsibility.
>
> A. Federal control and responsibility will include the portions of the project beyond the limits of Corps jurisdiction where the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project. These are cases where the environmental consequences of the additional portions of the projects are essentially products of Federal financing, assistance, direction, regulation, or approval (not including funding assistance solely in the form of general revenue sharing funds, with no Federal agency control over the subsequent use of such funds, and not including judicial or administrative civil or criminal enforcement actions).
>
> B. In determining whether sufficient cumulative Federal involvement exists to expand the scope of Federal action the district engineer should consider whether other Federal agencies are required to take Federal action under the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.), the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.), the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), Executive Order 11990, Protection of Wetlands, (42 U.S.C. 4321 91977), and other environmental review laws and executive orders.
>
> C. The district engineer should also refer to paragraphs 8(b) and 8(c) of this appendix for guidance on determining whether it should be the lead or a cooperating agency in these situations.

33 C.F.R. Pt. 325, App. B § 7.b. The Corps' regulations give examples as a guide to how specific permitting decisions should be handled.

> For those regulated activities that comprise merely a link in a transportation or utility transmission project, the scope of analysis should address the Federal action, i.e., the specific

activity requiring a DA permit and any other portion of the project that is within the control or responsibility of the Corps of Engineers (or other Federal agencies).

For example, a 50-mile electrical transmission cable crossing a 1 1/4 mile wide river that is a navigable water of the United States requires a DA permit.[12]  Neither the origin and destination of the cable nor its route to and from the navigable water, except as the route applies to the location and configuration of the crossing, are within the control or responsibility of the Corps of Engineers. Those matters would not be included in the scope of analysis which, in this case, would address the impacts of the specific cable crossing. Conversely, for those activities that require a DA permit for a major portion of a transportation or utility transmission project, so that the Corps permit bears upon the origin and destination as well as the route of the project outside the Corps regulatory boundaries, the scope of analysis should include those portions of the project outside the boundaries of the Corps section 10/404 regulatory jurisdiction.  To use the same example, if 30 miles of the 50-mile transmission line crossed wetlands or other "waters of the United States," the scope of analysis should reflect impacts of the whole 50-mile transmission line. . . .

In all cases, the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal.

33 C.F.R. Pt. 325, App. B § 7.b(3).

In a description of the project, the district engineer discussed the intake structure and pipeline as relevant to his analysis with respect to permitting:

a. Project Description: Construct a water intake structure, a 30-inch diameter transmission line and a 25-million-gallons per day (MGD) water treatment plant.  Construction of the intake structure includes a temporary 240-foot-long Z-pile cofferdam,[13] controlled blasting and dredging of up to 500 cubic yards of silt, sand, gravel, rock, and debris in the intake structure channel.  The transmission line will generally follow existing roadways and a natural gas pipeline, and have a total length of approximately 21 miles.  Construction of the transmission line includes the redeposit of soil material (fallback) incidental to pipeline excavation (550 cubic yards), and the discharge of bedding material (crushed stone) and riprap[14] at 17 creek/drainway crossings.  The total length of the 17 crossings is 272 feet. (0.051 mile or 0.0024% of the pipeline length). . . .

A.R. at 901-02.  The Water Works raises the argument that the district engineer was ambivalent about whether he was required to consider only the construction of the pipeline and intake structure or the entire Bessemer project.  Because, the Water Works contends, the district engineer was ambiguous about the scope of the review, the court should either interpret the review's scope to include the entire project and remand the case because the Corps failed to consider the entire

---

[12]  Note the striking similarity to the facts in Winnebago Tribe of Nebraska v. Ray, 621 F.2d at 270.

[13]  A cofferdam is "[a] temporary watertight enclosure that is pumped dry to expose the bottom of a body of water so that construction, as of piers, may be undertaken." AMERICAN HERITAGE DICTIONARY, 3ᴰ EDITION, at 368.

[14]  Riprap is "[a] loose assemblage of broken stones erected in water or on soft ground as a foundation" or a "broken stone[] used for such a foundation." AMERICAN HERITAGE DICTIONARY, 3ᴰ EDITION, at 1556.

project at points in the review, or the court should remand the case to the Corps for it to determine the appropriate scope of review.[15]  The Water Works bases its argument regarding the district engineer's apparent ambivalence on a statement of jurisdiction made in response to issues raised by the plaintiff concerning practicable alternatives and water allocation:

> The Corps jurisdiction in this permit application relates to the construction of the water intake structure and pipeline in jurisdictional waters of the United States.  The Corps does not have jurisdiction over the withdrawal or allocation of water from the Black Warrior River.  The primary focus of our evaluation is on the direct impacts of the intake structure, pipeline and treatment plant (e.g. navigation, water quality, threatened and endangered species, and cultural resources).  Corps regulations at 33 CFR 320.4(m) and guidance contained in Regulatory Guidance Letter 85-6 states that the primary responsibility for water allocation rests with the states.

A.R. at 916 (emphasis added).  The Water Works contends that the district engineer's statement that its focus was upon the "direct impacts of the intake structure, pipeline and treatment plant" constitutes a determination to review the entire Bessemer project.  The defendants, by contrast, consider the significant portion of the district engineer's description of his jurisdiction to be the limitation of jurisdiction to the intake structure and pipeline.

The district engineer's elaboration of the directly relevant impacts of the construction in the navigable waters in his description of the proposal (at A.R. at 901-02, above) indicates that his review was likely focused upon the consequences of that construction.  This is further evidenced by full consideration of the district engineer's statement of the Corps' jurisdiction.  The district engineer states quite clearly that the Corps' jurisdiction is limited to consideration of impacts of construction of the intake structure and pipeline.  That the district engineer goes on to state that the "primary focus of our evaluation is on the direct impacts of the intake structure, pipeline and treatment plant" is not meant as an extension of jurisdiction to the treatment plant, but is instead a description of the district engineer's analysis as concerning the consequences on navigation, water

---

[15] Of course, as this court realizes, if the Water Works is unhappy about the determination of the scope of the Corps' review on remand, it will file yet another action in this court.  In fact, this court envisions that the plaintiff will continue to resist the Bessemer project on permitting grounds until a higher federal court than this one finds that the Corps properly permitted the facility.  In this way, administrative procedure may encourage unfair competition and a waste of judicial resources.  For example, this case does not once concern itself in any depth with the substance of the Corps' decision, only with whether the Corps followed an elaborate set of procedures that are likely more difficult for the court to comprehend than the agency itself.  However, given their ornate and convoluted structure, an individual with enough monetary power who is opposed to a project of any sort can, by finding some threadbare indication that the regulations were not complied with or were not reasonable, either make the project economically unfeasible due to litigation costs or cause extreme delay in construction of the project sufficient to recoup the costs invested in litigation.

quality, threatened and endangered species and cultural resources that the intake structure and pipeline would create based upon the construction and maintenance of the entire project. In sum, the district engineer is concerned with the water treatment plant only insofar as it affects the effects of the intake structure and pipeline on navigation, etc.

The Water Works next challenges the reasonableness of the district engineer's interpretation of the regulations on the basis that the intake structure and pipeline are interdependent with the water treatment plant and that, consequently, the entire project should be considered. This argument by the Water Works is significantly similar to the enablement theory raised by the plaintiffs in Save the Bay. Save the Bay, Inc. v. United States Corps of Engineers, 610 F.2d at 327. According to the Water Works, the project is interdependent in that one portion of the project will not work without the other parts, such as the pipeline and intake structure. So much is true. But the same was the case with the titanium dioxide plant and industrial wastewater pipeline in Save the Bay. Id. Even though the reasoning of the Water Works is correct, legal support is absent. As our predecessor circuit found in Save the Bay, there is no support for an enablement theory. Id.[16] As the Ninth Circuit Court of Appeals noted in Sylvester v. U.S. Army Corps of Engineers, 884 F.2d at 398, this reasoning was incorporated into the regulations presently employed by the Corps in determining the scope of its jurisdiction.

The district engineer determined that the treatment plant did not fall under the regulatory control of other federal statutes and that the construction of the intake structure and the pipeline crossings comprised a link in the chain used to provide water to Bessemer. See 33 C.F.R. Pt. 325, App. B § 7.b(2). Again, the plaintiff argues that the intake structure and pipeline crossings enable the water treatment plant to operate and are therefore more than mere links in the chain.

The water treatment plant and the aspects of the project not related to the intake structure and the pipeline crossings are not within the scope of the Corps' jurisdiction in undertaking the public interest review. The intake structure and pipeline crossings comprise but a small portion of the entire project. The water treatment plant is far upland from the intake structure. Perhaps the intake structure and pipeline are more than mere links, but the Corps' permitting regulation over these structures constitutes no more than a "but-for" veto over the entire project. See Winnebago

---

[16] As this court noted earlier in this opinion, decisions of the Fifth Circuit Court of Appeals announce prior to the circuit split are binding upon this court, unless otherwise overruled by the Eleventh Circuit Court of Appeals.

Tribe of Nebraska v. Ray, 629 F.2d at 272. Even if the intake structure and pipeline are essential for the viability of the project, the district engineer was not acting improperly in determining, as with the example of the power line crossing the unavoidable river, that the structures' necessity did not permit the Corps to consider the entire project.

## C. Needs Analysis.

The Water Works next argues that in failing to adequately determine if Bessemer needed an additional supply of water, the Corps improperly conducted its needs analysis under its general public interest review. The defendants respond that the Water Works' argument that the Corps was required to perform a needs analysis is misguided.

33 C.F.R. § 320.4(a)(2)(ii) states:

> The following general criteria will be considered in the evaluation of every application:
>> (ii) The relative extent of the public and private need for the proposed structure or work. . .

The Corps contends that in the decision to permit the Bessemer project, a needs analysis was not necessary. In support of its position, the Corps cites 33 C.F.R. § 320.4(a)(3):

> The specific weight of each factor is determined by its importance and relevance to the particular proposal. Accordingly, how important a specific factor is and how much consideration it deserves will vary with each proposal. A specific factor may be given great weight on one proposal, while it may not be present or as important on another. However, full consideration and appropriate weight will be given to all comments, including those of federal, state, and local agencies, and other experts on all matters within their expertise.

The defendants reason that because any "specific factor," such as a needs analysis, "may not be present" in a public interest review that, at least in principle, the Corps was not required to perform a needs analysis in the instant case. Although the Corps is to be given some leeway in the interpretation of its own regulations, where the agency's action clearly diverges from its regulations, the matter ceases to be one of interpretation and becomes one of the Corps' failure to follow its own rules. The language permitting the district engineer to omit a factor from consideration is in contrast to the language in section 320.4(a)(2) which states that every application will contain an evaluation of needs.

Further, the needs analysis is considered a "criterion" to be considered in making a permitting determination, not a "factor." The term "factors" used in section 320.4(a)(3) more properly refers to the list of considerations contained at section 320.4(a)(1):

> All factors which may be relevant to the proposal must be considered including the

cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

The regulations envision these factors as not only standing alone in the analysis of public interest but also as partaking in the required criteria evaluations. For example, economic needs, environmental needs, mineral needs and the like can be considered, if such factors are applicable, in determining the public and private needs in question. Therefore, although one or more factors may be irrelevant in conducting a public interest review, it does not follow that consideration of a criterion is irrelevant.

The defendants contend that the Corps is to generally assume the need for a particular project to be genuine when the permit applicant is a "private applicant." See 33 C.F.R. § 320.4(q). The Corps, argues the defendants, interprets the term "private applicant" to mean any "non-federal" applicant, including municipal corporations. Bessemer being a private applicant, consideration of needs is not required.

33 C.F.R. § 320.4(q) states:

Economics. When private enterprise makes application for a permit, it will generally be assumed that appropriate economic evaluations have been completed, the proposal is economically viable, and is needed in the market place. However, the district engineer in appropriate cases, may make an independent review of the need for the project from the perspective of the overall public interest. The economic benefits of many projects are important to the local community and contribute to needed improvements in the local economic base, affecting such factors as employment, tax revenues, community cohesion, community services, and property values. . . .

There are two reasons that the application of this section for the determination of whether, as a practical matter, a needs analysis is required is questionable. First, the regulation refers specifically to the circumstance in which a "private enterprise makes an application for a permit." The defendants' argument that the regulatory history indicates that an economic needs analysis is inessential when the permit applicant is a municipal corporation is likewise questionable. The defendants rely on the interpretive guidance given in the preamble to 33 C.F.R. §§ 320-330. The relevant section of the Federal Register states:

Section 320.4(q): Some commenters believed that this rule would distort review criteria by inserting inappropriate economic assumptions and minimizing environmental criteria. Some commenters suggested that the Corps revise this paragraph to include a provision to

challenge an applicant's economic data and that of governmental agencies as well. Other commenters believe that economic factors do not belong in these regulations since the intent of the Clean Water Act is: "to restore and maintain the chemical, physical, and biological integrity of the nation's waters"; therefore, any regulation under the CWA should have, as its primary objective, provisions which give environmental factors the greatest weight. They were concerned that this part may be applied to allow economic benefits to offset negative environmental effects. Some commenters, however, believed that the Corps should assume that projects proposed by state and local governmental interests and private industry are economically viable and are needed in the marketplace. They also believed that the Corps and other governmental agencies should not engage in detailed economic evaluations. Economics has been included in the Corps list of public interest factors since 1970. However, there has never been a specific policy on economics in the regulations. The Corps generally accepts an applicant's determination that a proposed activity is needed and will be economically viable, but makes its own decision on whether a project should occur in waters of the U.S. The district engineer may determine that the impacts of a proposed project on the public interest may require more than a cursory evaluation of the need for the project. The depth of the evaluation would depend on the significance of the impacts and in unusual circumstances could include an independent economic analysis. The Corps will balance the economic need for a project along with other factors of the public interest. Accordingly, S 320.4(q) has been modified from the proposed rule to provide that the district engineer may make an independent review of the need for a project from the perspective of the public interest.

51 Fed. Reg. 41,206, 41,207-08(1986)(emphasis added). The interpretive guidance in the preamble to 33 C.F.R. §§ 320-330 does not fully clarify the issue. The portion of the preamble relied upon by the defendants, that "the Corps should assume that projects proposed by state and local governmental interests and private industry are economically viable and needed in the marketplace" is preceded by the words "[s]ome commenters . . . believed," indicating that the statement relied on by the defendants is merely a comment made to the Corps by a, perhaps, interested party. In addressing that comment, the preamble contains no indication of whether consideration of economic need is unnecessary for state and municipal permit applicants.

The second reason why section 320.4(q) may not obviate the requirement of a needs analysis is that it only discusses the use of an economic needs analysis. However, the needs analysis described in § 320.4(a)(2)(i) is not limited to economic need, but is to involve an evaluation of "the extent of the public and private need" of the project generally. This includes consideration, where relevant, of such factors as energy needs, mineral needs, food and fiber production and community cohesion.[17] The defendants contend that, whether a needs analysis was required or not, the district

_____

[17] This is not an exhaustive list, but solely an indicator of the factors that the Corps may find relevant to consider.

engineer conducted such an analysis. The plaintiff contests this, asserting that the district engineer failed to determine whether the need for water could be satisfied from another source without construction of the structure and pipeline. The Water Works reasons that because it could have provided the amount of water required by Bessemer from its own water supply, no need exists for the project.

The plaintiff relies on the case of State of North Carolina v. Hudson (Hudson I), 665 F. Supp. 428 (E.D.N.C. 1987) to support its contention that the Corps was required to examine the extent of Bessemer's need for water. In Hudson I, the City of Virginia Beach, Virginia, which had long been supplied water by the City of Norfolk, found itself in the position of having grown too large for its water source. Virginia Beach determined that it would eventually run short on water if it continued to rely upon the city of Norfolk's water supply. Virginia Beach applied for a Department of Army permit from the Corps, seeking to construct a pipeline originating at the Pea Hill Creek tributary of Lake Gaston on the Roanoke River, downstream from a Federal water supply at the John H. Kerr reservoir, and extending to Virginia Beach. The Corps permitted the pipeline and the case was brought to the district court. The court determined, among other things, that the Corps had failed to conduct a proper needs analysis of the pipeline construction:

> The Corps cannot accede to Virginia Beach's desire to have an autonomous water supply at the expense of the basin without at least examining the water supply available from its current source. No meaningful analysis of the extent of the public need for the project could otherwise be conducted. The need for the project depends on how much water Virginia Beach needs which in turn requires an analysis of its current supply.
>    The federal defendants and Virginia Beach repeatedly argue that as the diversion is only a "miniscule" portion of the abundant flow of the Roanoke River (about 1.2% of average flow) and the environmental impacts of such a proposal nearly "nonexistent," Virginia Beach's request for an autonomous water supply must be given priority in any public interest analysis. Such an argument, however, ignores the purpose of the public interest review and the correlative search for alternative courses of action. Nonsignificant impact does not equal no impact, and the purpose of the public interest review is to consider and balance competing interests, NEPA and non-NEPA factors, to determine whether the project is in the interest of the public. It requires the Corps to search for the least harmful alternative that is feasible. See River Road Alliance, Inc. v. Corps of Engineers, 764 F.2d at 452 (7th Cir.1985).

Id. at 446. In Hudson I, the requirement that the Corps show the precise need for the withdrawals of water stemmed from the fact that the withdrawals of water would affect, if only indirectly, the Kerr Reservoir managed by the Corps. The Corps' jurisdiction in Hudson I was, therefore, greater than the mere construction of the pipeline, extending to water storage in and allocation of federally-controlled water resources under Water Supply Act of 1958, 43 U.S.C. § 390b. The proposed

activity subject to the Corps' public interest review reached more than the mere construction of the pipeline, and had to include a valuation of the need of the water withdrawal itself.

As the defendants rightly point out, the only activity to be considered in this case is the construction of the intake structure and the associated pipeline crossings and its impact on navigation, etc., not the entire project. The Water Supply Act of 1958 is not implicated in this case. Therefore, the Corps was not required to consider water allocation, nor was it required to consider the economic benefit of an independent water system as opposed to purchase of water from the Water Works. See Clean Water Act § 101(g), 33 U.S.C. § 1251(g). It was only obligated to consider the public and private needs that the specific work would satisfy, balancing such factors as the public need for navigable waters and the like against Bessemer's need to create a water withdrawal source on the Black Warrior River.

The district engineer, in evaluating the public and private need of the project stated:

> Public needs and welfare: The [Water Works] is concerned that the Bessemer system will have a single water supply source and that a drought or emergency could jeopardize the flow of water to Bessemer's system. [The Water Works] contends its existing four-sources-of-water-supply system can better serve the needs of Bessemer customers. [The Water Works] also contends that permitting the Bessemer system in water that is "currently allocated or over allocated" is clearly not in the public's best interest.

A.R. at 915.

> The decision by the City of Bessemer to seek its own water supply and the consequences of the decision (higher prices, and reliability) are the responsibility of the locally elected officials, not the Corps.

A.R. at 917. The comment is entirely proper. The need of the project for the public is adequately reflected in the votes of the citizens of Bessemer, who will be the ones directly affected by the City's choice to build an independent water system. Their ability to express the fullness of their need by vote insures that their interests are considered.

Even this statement by the district engineer, however, is superfluous. Being required only to consider the tangible needs for the intake and pipeline construction and those things impacted that are within the scope of the Corps' review, the district engineer was not required to find that the public interest in the impacts related to the entire project were assured by the votes of the citizens of Bessemer, only that the need for the project outweighed the need for resources potentially damaged by the project.

The district engineer further considered the weight of public and private needs of those who did not have voting power over the Bessemer council.

> Although the granting of Bessemer's requested permit will provide a new water-withdrawal
> point on the Black Warrior River, it should not increase the demand for water in the short-
> term. The water to be withdrawn by Bessemer is currently being withdrawn by the [Water
> Works] at other locations and sold to Bessemer. If [the Water Works] developed new
> customers to replace Bessemer, additional demands on water resources would result. It is
> estimated that up to 70 percent of the water withdrawn by Bessemer would be returned to
> the Black Warrior River as treated waste water thus reducing the net withdrawal to 7.5
> [million gallons per day].
>
> The proposed Bessemer intake is downstream of all the [Water Works] intakes and will
> probably not impact the [Water Works'] withdrawal except during droughts when the
> Bankhead Lake level is low. Future increases in water withdrawals will likely impact
> navigation depths during droughts, however, the allocation of water for multi-purpose use is
> primarily a State issue. If navigational servitude is impaired, Federal authority to protect
> navigation could preempt the State's right to allocate water use.

A.R. at 917. To the extent that the district engineer's discussion dealt with the issue of water

allocation, it was superfluous. Otherwise, it was an appropriate consideration of public and private

need with respect to a navigational servitude on the Black Warrior River.

> Finally, the district engineer addressed the impacts of the construction itself:

> In response to the public notice, letters of no objection or authorization were received from
> the U.S. Fish and Wildlife Service, National Marine Fisheries Service, Alabama Department
> of Conservation and Natural Resources, Alabama Department of Environmental
> Management, Alabama State Docks, and the Alabama Historical Commission. Coordination
> with these agencies indicates that the proposed project will not adversely impact fish and
> wildlife, wetlands, threatened and endangered species, properties on or eligible for the
> National Register of Historic Places, navigation, and water quality.

A.R. at 916. Because there were no impacts upon these resources, there was no requirement that

the district engineer weigh the public and private need for these resources against the need for the

construction itself. The Corps appropriately addressed the public and private needs of the

proposed action.

## D. Alternative Sources.

The Water Works next challenges the Corps' analysis of alternatives to the proposed action,

contending that it was insufficient. 33 C.F.R. § 320.4(a)(ii) states:

> The following . . . will be considered in the evaluation of every application:
>> Where there are unresolved conflicts as to resource use, the practicability of using
>> reasonable alternative locations and methods to accomplish the objective of the
>> proposed structure or work. . .

In particular, the Water Works is concerned that the Corps failed to consider the "no-action"

alternative to construction of the intake facility. The Water Works' contentions are, however,

directed at the Corps' initial permitting decision, not the revised permitting decision upon which the present action is based. The court will nonetheless address these concerns as though they were directed at the revised permitting decision.

Regarding alternatives, the Corps stated:

7. ALTERNATIVES TO THE PROPOSED ACTION:

a. Birmingham Water Works/No Action Alternative: This alternative would require the applicant to continue to purchase water from the Birmingham Water Works. This alternative would require no permit action and would eliminate the minor environmental impacts associated with the proposed project. Since the overall project purpose is to provide an independent water supply system, including an independent supply source, this alternative does not meet the overall project purpose and is therefore not considered to be practicable.

b. Groundwater/No Action Alternative: The subsurface geologic formations in the project area do not yield groundwater in sufficient quantities to meet the applicant's needs. Groundwater is not a practicable alternative.

c. Warrior River Water Authority: The City of Bessemer and the Warrior River Authority attempted to negotiate an agreement which would provide the applicant with an independent water supply system without the need for the proposed water intake structure. A water transmission pipeline and treatment plant and the environmental impacts associated with these activities would remain. Because an agreement was not reached with the Warrior River Water Authority, this alternative is not available, thus not practicable.

A.R. at 910. The Corps reasonably discounted each of these alternatives. The no-action alternative requiring purchases of water from the Water Works was appropriately discounted as not in line with the project's purposes. The Corps' section 404 guidelines, which provide relevant guidance in the present alternatives analysis state:

An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

40 C.F.R. § 230.10(a)(2).[18] The alternative of purchasing water from the Water Works flouts the purpose of Bessemer's proposal and is therefore not an available alternative.

Further, whether practicable alternatives to the entire project (as opposed to the proposed activity to be permitted) exist is outside of the scope of the district engineer's analysis. As section 320.4(a)(ii) states, the Corps is only to consider practicable alternatives to "the proposed structure or work." The Corps was not required to consider obtaining water from the Water Works as an

---

[18] The court is employing the section 404 guidelines only as an aid for clarification, not as a substitute for the alternatives analysis to be conducted in the public interest review.

alternative to the construction of an entirely independent water supply by Bessemer.

In spite of plaintiff's assertions to the contrary, the Corps also considered carefully the option of Bessemer's obtaining water through use of the Warrior River Water Authority's intake structure. The record indicates that attempts by Bessemer at exercising this option floundered. A.R. at 842-44. The district engineer's determination that no practicable alternatives existed was neither arbitrary nor capricious.[19]

### E. Water Supply.

The plaintiff next contends that the Corps failed to conduct an adequate analysis based upon water supply and conservation. In arguing such, the Water Works states:

> The Corps' regulations clarify that in evaluating a proposed project's effects on water supply and conservation, the Corps must consider that:
>
> > Water is an essential resource, basic to human survival, economic growth, and the natural environment. Water conservation requires the efficient use of water resources in all actions which involve the significant use of water or that significantly affect the availability of water for alternative uses including opportunities to reduce demand and improve efficiency in order to minimize new supply requirements. Actions affecting water quantities are subject to Congressional policy as stated in section 101(g) of the Clean Water Act which provides that the authority of states to allocate water quantities shall not be superceded, abrogated, or otherwise impaired.

Plaintiff's Brief in Response to Motion for Summary Judgment at 35 (quoting 33 C.F.R. § 320.4(m)). The defendants argue that the Corps has no authority to consider the allocation of water among communities, as the plaintiff suggests. Section 101(g) of the Clean Water Act, 33 U.S.C. § 1251(g) (emphasis added), states:

> It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

The Water Works argues that a construction of section 101(g) of the Clean Water Act (also known

---

[19] Although the Water Works never raises the issue and it is therefore not properly before the court for determination, the court has been unable to find any basis in the record (although it might be due to an oversight by this court) for the Corps' determination that groundwater wells were an insufficient supply source. However, as this issue was not raised by the plaintiff (and that there is a basis buried somewhere in the near-thousand-page record), the court cannot foreclose the defendants' summary judgment motion(s) on this ground.

as the Wallop amendment) that takes away the Corps' authority to address the allocation of water resources would render 33 C.F.R. § 320.4(m) nugatory. The court does not see this. Section 320.4(m) merely underscores the policy announced in the Wallop amendment that the Corps not make its permitting decisions on the basis of water supply, thereby overruling state law water allocation determinations.

> In debate, Senator Wallop, sponsor of the amendment that became section 101(g), stated:

> The requirements of section 402 and 404 [Clean Water Act] permits may incidentally affect individual water rights . . . . It is not the purpose of this amendment to prohibit those incidental effects. It is the purpose of this amendment to insure that State allocation systems are not subverted, and that effects on individual rights, if any, are prompted by legitimate and necessary water quality considerations. This amendment is an attempt to recognize the historic allocation rights contained in State constitutions. It is designed to protect historic rights from mischievous abrogation by those who would use an act, designed solely to protect water quality and wetlands, for other purposes. It does not interfere with the legitimate purposes for which the act was designed.

3 Leg. Hist. 532 (Senate Debate, Dec. 15, 1977). See also United States v. Akers, 785 F.2d 814, 820-21 (9th Cir. 1986) (stating that water allocation is only relevant in the permitting process if it is clear that federal environmental concerns conflict with state law water allocation. In such instances, accommodation between the federal and state interests is to be obtained through the permitting process. Such is not the case here.). As is clear from the above, the Wallop amendment was meant to prevent an entity, such as the Water Works, that had found itself unable to prevent reallocation of water resources under state law to use the Corps' permitting process to block the allocation on the ground that the allegedly aggrieved entity was somehow a better water source.

The Water Works further contends that the Tenth Circuit Court of Appeals, in Riverside Irrigation District v. Andrews, 758 F.2d 508 (10th Cir. 1985), held that Congress did not intend to limit the Corps' ability to consider water allocation in the issuance of permits. Instead, argues the plaintiff, Congress' intent was merely that the Corps find an accommodation between state water allocation and federal interests. The plaintiff's argument is unavailing. Riverside involved the denial of issuance of a nationwide permit, rather than an individual permit as is sought by Bessemer. In Riverside, the Tenth Circuit found that the Corps had the statutory authority to consider water quantity in the grant of nationwide permits. Id. at 512. Unlike a individual permitting analysis, for which no statute exists permitting an investigation of water quality, in a nationwide permitting decisions, "[s]ection 101(g), which is only a general policy statement 'cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly stated

purpose.'" Id. at 513 (citing Connecticut Light and Power Co. v. Federal Power Commission, 324 U.S. 515, 527 (1945)).

### F. Economic Impacts.

The Water Works argues that the Corps improperly neglected to conduct an analysis based upon the economic impacts of the project. The Water Works' arguments raised on this issue are largely a rehash of those raised in its argument that the Corps failed to perform a needs analysis. The only added wrinkle in the plaintiff's argument that an economic analysis was necessary is its discussion of Van Abbema v. Fornell, 807 F.2d 633 (7th Cir. 1986). The arguments related to this case and the Corps failure to conduct a proper economic analysis relates to the adequacy of the Corps' NEPA review, not the public interest review. The court notes, with respect to the public interest review, that the Corps is only required to consider the economics of the proposed action if it is of significant import to the decision to permit. See 33 C.F.R. § 320.4(a)(3). Economic impact does not appear to be a significant feature of the decision to grant or deny the permit because the focus of the study is not upon the value of the entire Bessemer water project, but upon the construction of an intake structure and an associated pipeline.

The Corps did address the economics of the building the entire project, as the Water Works demands, although no such analysis was required:

> The [Water Works] contends that Bessemer's proposed water system would cost Bessemer between 27 percent and 49 percent more annually than does water currently supplied by the [Water Works]. [The Water Works] also contends that the Bessemer system would require that [the Water Works] reallocate its current water to other large customers, and place a "demand charge" on Bessemer if the [Water Works] is to remain as a back-up supply. [The Water Works] states that its other customers may have to absorb the loss of Bessemer revenues through rate increases for water.

A.R. at 915-16. The district engineer responded to these concerns:

> The decision by the City of Bessemer to seek its own water supply and the consequences of the decision (higher prices, and reliability) are the responsibility of the locally elected officials, not the Corps. . . .

A.R. at 917. The Corps determination was not arbitrary and capricious.

### G. Water Quality.

The Water Works contends that the Corps failed to conduct an adequate analysis of the water quality impacts of the decision to permit the construction of the intake structure and pipeline.

33

First, states the Water Works, the Alabama Department of Environmental Management ("ADEM") issued a water quality certificate for the project based on its review of the public notice and "all associated materials submitted related to the proposed project." Because the materials submitted to ADEM did not contain information relating to the pipeline, argues the Water Works, its water quality certificate was based on incomplete data and cannot support the Corps' determination that water quality would not be severely adversely affected. Second, argues the plaintiff, by the time that the permitting decision was made, the water quality certificate had expired.

The defendants respond that the inadequacies of the water quality certificate are irrelevant to the Corps' permitting decision and the concerns of the Water Works should be taken up with the ADEM. Further, answers the defendants, the Corps did not confine its consideration of water quality to the water quality certificate issued by ADEM.

33 C.F.R. § 320.4(d) sets out the extent of the district engineer's review of the impacts of water quality:

> Water quality. Applications for permits for activities which may adversely affect the quality of waters of the United States will be evaluated for compliance with applicable effluent limitations and water quality standards, during the construction and subsequent operation of the proposed activity. The evaluation should include the consideration of both point and non-point sources of pollution. It should be noted, however, that the Clean Water Act assigns responsibility for control of non-point sources of pollution to the states. Certification of compliance with applicable effluent limitations and water quality standards required under provisions of section 401 of the Clean Water Act will be considered conclusive with respect to water quality considerations unless the Regional Administrator, Environmental Protection Agency (EPA), advises of other water quality aspects to be taken into consideration.

The district engineer stated in its section 404 evaluation of the "Potential Impacts on Physical and Chemical Characteristics of the Aquatic Ecosystem":

> b. Water, Suspended Particulates and Turbidity: Most of the dredged/excavated material will be discharged and confined to upland sites. There will be a temporary, short term, increase in the water turbidity during dredging and pipeline construction, which will be temporary and will subside upon completion of work. Best management practices to minimize turbidity will be required, if a permit is issued. See paragraph 11.a for other turbidity limiting measures required by the [ADEM]. Impacts on photosynthesis, sight-dependent species, dissolved oxygen, water chemistry (including nutrients, organic material, color, odor and taste) and aesthetics should not be significant because of the small discharge volume, nature of the discharged material (alluvial soils, and commercially obtained crushed stone), limited area of the discharge sites, short duration of work and the requirements of the ADEM water quality certification.

A.R. 950. The district engineer appropriately relied upon determinations by ADEM and, in

34

addition, fully considered the effects of the proposed activity on water quality. In addition, because the water quality conditions imposed in the reissued permit are based upon non-site-specific good construction practices, the district engineer's evaluation of effects on water quality was not arbitrary and capricious.

## H. Threatened and Endangered Species.

With respect to endangered and threatened species, the district engineer stated:

Endangered and Threatened Species: In response to the public notice, the U.S. Fish and Wildlife Service recommended the entire area that could be impacted in and adjacent to the Black Warrior River be surveyed for the endangered Flattened Musk Turtle (Sternotherus depressus).
The survey was conducted by a qualified biologist and a report was submitted to the Fish and Wildlife Service. The report concluded that it is unlikely the site immediately adjacent to the proposed construction site has a resident population of Flattened Musk turtles. Although suitable habitat exists several hundred yards upstream and downstream, construction impacts should be very localized and should not impact those potential resident populations.
Although the pipeline and treatment plant sites are within the range of several Federally listed endangered species, due to the limited nature of the work, the proposed work should not impact any listed endangered or threatened species or critical habitat for such species. By letter dated 22 March 1996, Mr. Larry E. Goldman, Field Supervisor, U.S. Fish and Wildlife Service wrote: "No significant adverse effects on fish and wildlife resources are expected to result from this proposed work. Therefore, we have no objections to issuance of this permit."
After written consultation . . . with the U.S. Fish and Wildlife Service in accordance with 50 CFR Part 402, it is my determination that the proposed project (intake, pipeline and treatment plant) will not likely jeopardize the continued existence of any listed species of result in the destruction of [sic] adverse modification of critical habitat.

A.R. at 906-07. The plaintiff argues that the Corps did not evaluate what impacts operation and maintenance of the intake structure and pipeline would have on the flattened musk turtle, an endangered species. The defendants answer that the Corps properly relied upon a determination by the U.S. Fish and Wildlife Service that no significant adverse effects on threatened or endangered species would occur. Because the U.S. Fish and Wildlife Service is to consider the impacts both of construction and operation at the site, the defendants argue, the Corps properly relied upon the determination of the U.S. Fish and Wildlife Service in coming to its decision.

33 C.F.R. § 320.4(c) states:

Fish and wildlife. In accordance with the Fish and Wildlife Coordination Act (paragraph 320.3(e) of this section) district engineers will consult with the Regional Director, U.S. Fish and Wildlife Service, the Regional Director, National Marine Fisheries Service, and the head of the agency responsible for fish and wildlife for the state in which work is to be

> performed, with a view to the conservation of wildlife resources by prevention of their
> direct and indirect loss and damage due to the activity proposed in a permit application. The
> Army will give full consideration to the views of those agencies on fish and wildlife matters
> in deciding on the issuance, denial, or conditioning of individual or general permits.

The Corps consulted with the appropriate agencies and made its decision in consultation with them.
The determination that little harm would come to the flattened musk turtle was not arbitrary and
capricious.

The plaintiff also contends that the Corps' analysis of the effects of construction and
maintenance of the intake structure and pipeline on the mussel population was wrong because the
study from which the Corps' conclusions were drawn were taken at a "bad" time of year. The
court is not to remand agency action because the data on which the decision is made was drawn at
an infortuitous time. The court's review is only to address whether substantial evidence exists to
support the agency decision, such as is present here. The decision in this regard was not arbitrary
and capricious.

III. SECTION 404(B)(1) GUIDELINES FOR SPECIFICATION OF DISPOSAL SITES FOR DREDGED AND
FILL MATERIAL.

The plaintiff contends that two errors occurred in the Corps' section 404(b)(1) guidelines
review. First, claims the plaintiff, the district engineer failed to consider impacts of the Corps'
action on human uses of the water and, second, the district engineer failed to make an appropriate
evaluation of alternatives to the proposed "dredge and fill" action.

**A. Impacts on Human Uses.**

The plaintiff contends that the Corps failed to adequately consider the impacts of the
"dredge and fill" action on human uses of the water. The Water Works states that the Corps,
although it was required to consider the impact of the dredge and fill activity on municipal and
private water supplies, did not properly consider the effects of the addition of a twenty-five million
gallon per day withdrawal site to the Black Warrior River on the quantity of water available for
consumers. The defendants respond that the Corps was not required to consider the consequences
of the withdrawal of water from the Black Warrior River under its section 404(b)(1) review, but
only the impacts of the dredge and fill activity itself.

40 C.F.R. § 230.5 states:

36

In evaluating whether a particular discharge site may be specified, the permitting authority should use the Guidelines in the following sequence:

(f) Identify and evaluate any special or critical characteristics of the candidate disposal site, and surrounding areas which might be affected by use of such site, related to their living communities or human uses . . . .

In 40 C.F.R. Pt. 230, Subpt. F, the guidelines specify the factors relevant to human uses that should be considered by the Corps. Section 230.50 concerns municipal and private water supplies:

(a) Municipal and private water supplies consist of surface water or ground water which is directed to the intake of a municipal or private water supply system.
(b) Possible loss of values: Discharges can affect the quality of water supplies with respect to color, taste, odor, chemical content and suspended particulate concentration, in such a way as to reduce the fitness of the water for consumption. Water can be rendered unpalatable or unhealthy by the addition of suspended particulates, viruses and pathogenic organisms, and dissolved materials. The expense of removing such substances before the water is delivered for consumption can be high. Discharges may also affect the quantity of water available for municipal and private water supplies. In addition, certain commonly used water treatment chemicals have the potential for combining with some suspended or dissolved substances from dredged or fill material to form other products that can have a toxic effect on consumers.

The Water Works' contention about water supply is misplaced. Section 230.50 does not require the Corps to consider the impacts of withdrawal of water on supply in its section 404(b)(1) review, only the impacts on water supply caused by the addition of fill (and particulate matter) into the water.

## B. Practicable Alternatives.

In conducting its 404(b)(1) guidelines analysis, the Corps is to consider practicable alternatives to the action requiring the discharge of dredge or fill material:

Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.
(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.
(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:
(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;
(ii) Discharge of dredged or fill material at other locations in waters of the United States or ocean waters;
(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which

37

could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

33 C.F.R. 230.10(a)(1)&(2).

The plaintiff argues that the no-action alternative of purchasing water from the Water Works was a practicable alternative that would have a "less adverse impact on the aquatic ecosystem." The Water Works claims that because the purchase of water from it would require no discharge into the waters of the United States, it is a preferred alternative that the Corps was required to recognize.

The defendants respond to this that the purchase of water from the Water Works is not a practicable alternative because the purchase does not conform to the overall project purpose of providing Bessemer with an independent water system. The plaintiff answers the defendants by contending that the Corps gerrymandered the project purpose such that the alternative of water purchase from the Water Works was not practicable. The court does not see any gerrymandering of the project purpose to avoid consideration of water purchase from the Water Works. It is clear to this court from the administrative record that Bessemer's incipient desire was to sever its reliance on the Water Works and the Water Works control over those who must depend upon it for water. See National Wildlife Federation v. Whistler, 27 F.3d 1341, 1345 (11th Cir. 1994).


IV. NATIONAL ENVIRONMENTAL POLICY ACT REVIEW.

The plaintiff's final claim is that the Corps failed to conduct a proper alternatives analysis in its environmental assessment. The court must first determine the standard of review required by NEPA. In North Buckhead Civic Association v. Skinner, 903 F.2d 1533, 1538 (11th Cir. 1990), the Eleventh Circuit Court of Appeals determined that an arbitrary and capricious standard is the proper standard of review over a NEPA determination.

> In Marsh v. Oregon Natural Resources Council, the Supreme Court considered the question of judicial review under NEPA and explicitly rejected the reasonableness standard. The Court adopted instead the arbitrary and capricious standard as set forth in § 706(2)(A) of the Administrative Procedure Act. We, therefore, adopt the arbitrary and capricious standard when reviewing agency action in NEPA cases; if the agency action was not arbitrary or capricious, it should not be set aside.

The NEPA implementation regulations state that "the EA shall include a discussion of the reasonable alternatives which are to be considered by the ultimate decision-maker." 33 C.F.R. Pt. 325 App. B § 7.a. As demonstrated in the court's discussion of the public interest review, all

38

alternatives were discussed and reasonably considered.

### Conclusion

For the foregoing reasons the defendants' motion(s) for summary judgment will be GRANTED. The plaintiff's motion will be DENIED. The case will be DISMISSED, with prejudice.

This _____ day of October 1997.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE